* * * * * * * * * * *
The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments of the parties. The appealing party has not shown good grounds to reconsider the evidence, receive further evidence, rehear the parties or their representatives, or amend the Opinion and Award.
 * * * * * * * * * * *
The Full Commission finds as a fact and concludes as matters of law the following, which were entered into by parties as:
 STIPULATIONS
1. The employee-employer relationship existed on October 9, 2003, between plaintiff and Edwards Wood Products.
2. Forestry Mutual Insurance Company was the carrier for the defendant-employer on October 9, 2003.
3. The parties are subject to the North Carolina Workers' Compensation Act.
4. The parties stated they would submit a Form 22 but none was submitted. Therefore, the Form 22 in the file was used to determine average weekly wage.
5. Defendant-Employer regularly employs three or more employees and is bound by the provisions of the North Carolina Workers' Compensation Act.
6. The Industrial Commission has jurisdiction of the parties, and all parties have been properly named in this action.
7. The parties stipulated the following documents into evidence:
 a. Pre-Trial Agreement
 b. Plaintiff's DOT Application for Employment with Edwards Wood Products
 c. Edwards Wood Products Requirements for Commercial Drivers and Job Description for Commercial Drivers
 d. Accident Report for 10/9/03 accident
 e. Termination Report
 f. Medical Records.
8. All NCIC Forms, documents, depositions, and medical records previously entered into evidence before Deputy Commissioner Theresa B. Stephenson are stipulated to by the Parties without further authentication.
 * * * * * * * * * * *
Based upon all the competent evidence from the record, the Full Commission finds as follows:
 FINDINGS OF FACT
1. Plaintiff who was born on September 3, 1961 and at the time of the hearing before the Deputy Commissioner was 43 years old, is the father of 4 children, and a high school graduate. Plaintiff also attended Alliance Driving School for 4 weeks in 1982 or 1983 to become a truck driver and has worked as a truck driver since then. Prior to working for Edwards Wood Products, Plaintiff worked as an over-the-road truck driver for Grayson Mitchell, Inc.
2. Based on the Form 22 present in the record, plaintiff had an average weekly wage of $786.94 with a compensation rate of $524.65, while working for Edwards Wood Products.
3. On or about May 16, 2003, while driving a truck for Grayson Mitchell, Inc., plaintiff was involved in an accident during which a pick-up truck came across the centerline and collided with him head-on. A woman and her 5-year old grandchild were in the truck and plaintiff saw the woman die. Plaintiff was injured but able to walk away from the accident. The driver of the pickup was faulted for the accident and plaintiff did not receive a ticket. Plaintiff went to Central Carolina Hospital where he was treated for multiple strains and released the same day with medications.
4. At the direction of the workers' compensation carrier for Grayson Mitchell, Inc., plaintiff received further follow-up care at Scotland Memorial Hospital Occupational Health Services and was treated by Dr. Sebastian Ciacchella. Plaintiff participated in physical therapy and last saw Dr. Ciacchella on July 2, 2003, at which time he was released to resume full duties at work on July 7, 2003.
5. Plaintiff returned to work for Grayson Mitchell, Inc. on July 7, 2003. Plaintiff received workers' compensation benefits while he was out of work from May 17, 2003 through July 6, 2003. Plaintiff resigned from Grayson Mitchell, Inc. on August 6, 2003. Plaintiff told Kelly Edwards at Grayson Mitchell, Inc. that he quit because he could not see himself driving a truck anymore and he kept seeing the face of the woman that died in the accident. Also, plaintiff told Ms. Edwards about his trouble sleeping, as well as his dreams about the woman.
6. Plaintiff requested additional medical treatment from the carrier for Grayson Mitchell, Inc. On August 12, 2003, plaintiff sought treatment at Scotland Memorial Hospital Occupational Health Services and saw Dr. Lloyd McCaskill. On August 12, 2003, plaintiff reported to Dr. McCaskill that he was unable to sleep, he was very irritable and short tempered, and he was unable to drive. Dr. McCaskill diagnosed plaintiff with post-traumatic stress disorder (PTSD). Dr. McCaskill said he would get plaintiff an appointment with a psychiatrist. The stipulated medical records indicate Dr. McCaskill prescribed Xanax (.5 mg, three times per day) for plaintiff on August 12, 2003; Dr. McCaskill verified this during his deposition. Plaintiff testified that he did not remember being prescribed Xanax.
7. Also on August 12, 2003, Dr. McCaskill gave plaintiff a "Work Restrictions and Limitations" note. Dr. McCaskill testified that this is a note that he completes and gives to his patients to take back to their employers. Dr. McCaskill clarified the handwritten "specific job restrictions" he gave plaintiff on August 12, 2003: "This man is experiencing post-traumatic syndrome. In my opinion, he should not be driving a truck in his present mental state." Dr. McCaskill did not see plaintiff back for further treatment. Dr. McCaskill referred plaintiff to a psychiatrist, Dr. Logan for a psychiatric evaluation. Plaintiff stated he never saw Dr. Logan because the workers' compensation carrier for Grayson Mitchell, Inc denied psychiatric treatment.
8. On August 8, 2003, Carol Hare, medical case manager assigned to plaintiff's workers' compensation claim against Grayson Mitchell, Inc., sent Dr. McCaskill a facsimile with questions to answer. Dr. McCaskill testified that he did receive the fax and he completed and signed the questionnaire on August 25, 2003.
9. The questionnaire asked for the diagnosis, which was post-traumatic stress syndrome, and whether plaintiff had a change in his condition. Dr. McCaskill answered that plaintiff was physically recovered from the accident but was now having post-traumatic stress syndrome that prevented his driving a truck safely. Dr. McCaskill went on to state that in his opinion, plaintiff needed a psychiatric evaluation. Dr. McCaskill testified that his secretary would have handled returning the questionnaire to the nurse case manager.
10. After quitting his job at Grayson Mitchell, Inc. plaintiff did not receive any further workers' compensation benefits from their workers' compensation carrier. Plaintiff did not look for any work outside of the truck driving field and testified that when he applied for employment with Edwards Wood Products, he had no income, was behind on his bills and needed a job. On August 29, 2003, plaintiff applied for a truck driving position at Edwards Wood Products, a company that manufactures hardwood pallets and graded lumber. The truck driving position was for local driving only.
11. Following the hearing, the parties took the deposition of lay witness, Tom Ward, transportation safety manager at Edwards Wood Products. Mr. Ward has been the transportation safety manager for 14 years. In that capacity, Mr. Ward recruits and hires drivers and ensures the company's compliance with the Federal Motor Carrier regulations. Mr. Ward went through the hiring process, which began with an individual reading and reviewing the job requirements for a driver, then completing an application. The requirements include two years of recent verifiable tractor trailer experience, a good driving record, i.e. five points or less on their driving record, passing a DOT physical, a negative drug screen, and a road test. Mr. Ward is the one who actually hires the drivers once they have met all the necessary requirements, and he personally hired plaintiff. Plaintiff completed and signed a DOT application on August 29, 2003; at the time, it was the standard application used by Edwards Wood Products.
12. The DOT application has a section for "Accidents for 3 years" and "Traffic Violations." Mr. Ward explained that the type of accident does not matter and all accidents are supposed to be listed. Mr. Ward testified that someone holding a CDL would know that they are to reveal all accidents, both preventable and nonpreventable, on the DOT application. Plaintiff had held a CDL for more than 10 years. On his application, plaintiff represented that he had not been in any accidents in the last 3 years or more. Specifically, he did not list the May 16, 2003 accident. The DOT application form the plaintiff filled out has a clear delineation between traffic accidents and traffic convictions, separating the two categories into separate blocks of information. Plaintiff wrote "none" in both blocks. On his application, plaintiff represented that there was no reason why he would be unable to perform the functions of the job. Plaintiff signed the application and certified that the entries were true and complete. The application states "false or misleading information given in my application or interview(s) may result in discharge."
13. The DOT application also asks for employment history, and Mr. Ward then checks at least the last 3 years of employment. Typically, Mr. Ward calls the previous employers, then faxes them a standard form to complete. Mr. Ward asks for employment dates, type of equipment operated and type of license. Mr. Ward also pulls an applicant's driving record that he accesses on his computer system, which is linked to the "DAK system." The driving record is supposed to include accidents, tickets and any violations the individual has had, in all states. When Mr. Ward pulled plaintiff's driving record, no accidents or points showed up, which Mr. Ward stated was an excellent driving record. According to Mr. Ward, the accident in May 2003 should have shown up on plaintiff's driving record even if plaintiff was not at fault. Mr. Ward did not know why the May 2003 accident did not appear on plaintiff's driving record.
14. Plaintiff testified at the hearing before the Deputy Commissioner that he told Mr. Ward about the May 2003 accident. Mr. Ward did not recall plaintiff telling him about the May 2003 accident. While it would not have necessarily been a reason not to hire plaintiff, Mr. Ward stated he would have wanted to talk to plaintiff more about it, given that it occurred within the last 3 months and involved a fatality. Mr. Ward did not remember speaking with plaintiff about this. Mr. Ward states he was not aware that at the time he hired him, plaintiff had been diagnosed with post-traumatic stress disorder. Mr. Ward also states he was not aware that in August 2003, plaintiff had been prescribed Xanax and referred for a psychiatric evaluation. Mr. Ward testified that he relies entirely on the medical professionals that do the DOT physicals to clear applicants for hire from a medical standpoint.
15. On September 1, 2003, plaintiff underwent a DOT physical with physician's assistant, Donna Grzywacz, at Scotland Memorial Hospital Occupational Health Services. Dr. McCaskill was Ms. Grzywacz's backup physician and reviewed what she found during the physical. Because of what he had noted during his evaluation of plaintiff on August 12, 2003, Dr. McCaskill spoke to plaintiff at the DOT physical; plaintiff told him he felt he was capable of driving a truck and Dr. McCaskill made a note of this. Dr. McCaskill testified that he spent less than 5 minutes speaking with plaintiff during the DOT physical. He "merely walked in the room and asked him specific questions about was he having any anxiety or was he resting better, things like that in general." Based on this brief conversation with plaintiff and plaintiff's representations to him that he was resting better and that he was stable to operate a truck, Dr. McCaskill signed off on the DOT physical. Dr. McCaskill did not review any medical records; he did not speak with any of plaintiff's other doctors.
16. Dr. McCaskill testified that he thought he could recognize post-traumatic disorder but did not feel competent treating it. Dr. McCaskill indicated that if he sees a patient has indicators of post-traumatic disorder, the patient is always referred to a psychiatrist. Dr. McCaskill referred plaintiff to a psychiatrist on August 12, 2003. It was Dr. McCaskill's understanding that his secretary had made an appointment for plaintiff to see the psychiatrist, but he did not know if plaintiff kept the appointment. Dr. McCaskill also testified that he did not know if plaintiff had filled the prescription for Xanax that he had given him on August 12, 2003.
17. Edwards Wood Products hired plaintiff and he began work on September 8, 2003. Submitting a job application containing false information constitutes grounds for termination at Edwards Wood Products. Mr. Ward testified that he has previously terminated someone for submitting an application containing false information.
18. On October 9, 2003, plaintiff was involved in another accident. While plaintiff was rounding a curve, his load shifted, causing him to turn his truck over. Plaintiff was cited for the accident for driving too fast for conditions. Plaintiff testified that the straps on his load broke and that is what caused his load to come loose and turn the truck over. On the day of the October 9, 2003 accident, Mr. Ward went to the accident scene as soon as he found out about it. When he arrived, plaintiff had already been taken by ambulance to the hospital.
19. Mr. Ward conducted an investigation of the accident in conjunction with the highway patrol. During his investigation, Mr. Ward saw no evidence that the straps on the load broke as plaintiff had testified at the hearing before the Deputy Commissioner. Mr. Ward completed and signed the Termination Report, which noted plaintiff was terminated for a preventable accident. A preventable accident is one in which the driver is at fault or the driver caused the accident. A nonpreventable accident "is an accident that you had that you could not prevent, period." Edwards Wood Products makes a distinction between preventable and nonpreventable accidents because they follow the Federal Motor Carriers policies.
20. Mr. Ward clarified that the date of injury, listed on the report as 10-9-04 was supposed to be 10-9-03. Plaintiff testified that he has not looked for employment since being terminated on October 16, 2003. Mr. Ward testified that it is company policy that drivers be terminated for preventable accidents. The policy applies to all drivers and went into effect in 2002; every driver since then that has had a preventable accident has been terminated. Mr. Ward indicated that if plaintiff had not had a preventable accident, he would not have been terminated and he would still be an employee of Edwards Wood Products, with a job available for him once his doctor released him to return to work. Additionally, Mr. Ward testified that Edwards Wood Products had suitable light duty work available in the purchasing and supply area.
21. Following the October 9, 2003 accident, plaintiff came under the care of Dr. Nigel Watt. He diagnosed plaintiff with a displaced right forearm mid-shaft radius fracture which he repaired surgically on October 9, 2003. On October 25, 2004, Dr. Watt indicated plaintiff had reached maximum medical improvement. No further surgery was recommended, but Dr. Watt stated plaintiff could continue with weight training, strength exercises and other activities as desired. Dr. Watt released plaintiff to return to work without restrictions on February 25, 2004 and issued a 3% permanent partial disability to the right arm. Plaintiff was released from treatment to return as needed; plaintiff did not return to Dr. Watt thereafter. Dr. Watt did not make a note in his medical records of any symptoms of anxiety or the need for psychiatric treatment.
22. Elizabeth Whittle worked at Carolina Behavioral Care as a counselor from May 1995 to November 2004. She saw plaintiff while working at Carolina Behavioral Care; Dr. Tamakloe was the physician who managed plaintiff's medication. Ms. Whittle first saw plaintiff on February 12, 2004. Plaintiff gave a history of an accident on May 17, 2003 while driving a truck; the driver of the other car was killed. He also indicated he had gone back to work and had another accident in which he broke his arm.
23. On February 12, 2004, plaintiff's symptoms included nervousness, irritability, difficulty sleeping and flashbacks. These symptoms began after the first accident in May 2003. Plaintiff reported to her that he had sought treatment after the first accident, but did not really get any help other than a suggestion that he take over-the-counter sleep medication. Plaintiff testified at the hearing before the Deputy Commissioner that his problems with dreams of the May 2003 accident and the lady who died continued after he started working at Edwards Wood Products right up until the day of the October 9, 2003 accident. After seeing plaintiff on February 12, 2004, Ms. Whittle set plaintiff up for counseling with her and referred him for a psychiatric evaluation with Dr. Tamakloe. She began her counseling sessions with plaintiff on February 24, 2004.
24. During the counseling sessions, they would discuss how plaintiff was doing with the purpose being to help him deal with the events that have happened and control the anxiety. Ms. Whittle testified that plaintiff's flashbacks were usually of the woman in the car who was killed in the May 2003 accident. Plaintiff suffered a relapse sometime in March or April 2004 due to difficulties his daughter was having. His symptoms of anxiety, depression and irritability increased at that time as a result. Plaintiff suffered another setback in May 2004 after a friend died suddenly; plaintiff felt that he had in some way contributed to his death or had not done everything he could. Ms. Whittle stated plaintiff in a sense was reliving what he went through with the initial accident in May 2003. Later, in July 2004, plaintiff had a recurrence of more severe symptoms when he stopped taking his medication. During that same period, plaintiff had an argument with his girlfriend. In August, plaintiff suffered another setback when several deaths in his family occurred. Plaintiff experienced more symptoms of anxiety, flashbacks, difficulty sleeping and dreams. These symptoms continued into September; plaintiff reported feeling guilty about the woman who was killed in the May 2003 accident.
25. Ms. Whittle last saw plaintiff on September 28, 2004; at that time, he was still having difficulty. Ms. Whittle described Plaintiff's progress over her course of treatment as uneven, which was not unusual. She did not see plaintiff after she left Carolina Behavioral Care.
26. In her deposition, when asked whether the collision of October 9, 2003 significantly contributed to the consolidation of plaintiff's post-traumatic stress syndrome, Ms. Whittle stated, "I don't know. I think the second accident consolidated, you know, and really sort of was the straw that broke the camel's back, as far as, you know, being able to function". Notwithstanding Ms. Whittle's work as a counselor, the competent evidence in the record fails to establish Ms. Whittle as an expert in the treatment and diagnosis of PTSD.
27. Dr. David Marcotte is a psychiatrist with forty years of experience. He became fully licensed to practice medicine in North Carolina in 1981. He is board certified in psychiatry and neurology. In addition, Dr. Marcotte has experience in forensic psychiatry dating back to 1975. He was tendered, without objection, as an expert in psychiatry.
28. In relation to this case, Dr. Marcotte reviewed all of the stipulated medical records. Dr. Marcotte was able to list the criteria used to diagnose post-traumatic stress disorder and define the condition generally. He also explained the differences between the types of post-traumatic stress disorder, i.e. immediate, delayed and chronic. He testified he had treated patients for post-traumatic stress disorder in the past; specifically, Dr. Marcotte had evaluated nine of the people who had been trapped in the building during the fire at the chicken plant in Hamlet. Dr. Marcotte stated that plaintiff did not have an immediate response to the May 2003 accident in which the other driver was killed; no symptoms were noted in the medical records until three months after the accident, which would be consistent with a "delayed" response. The May 2003 accident, in Dr. Marcotte's opinion, would "absolutely" qualify as a "traumatic event." In August 2003, plaintiff complained to Dr. McCaskill of symptoms that are "commonly associated with post-traumatic stress disorder." On August 25, 2003, Dr. McCaskill indicated that plaintiff should not be driving a truck due to his PTSD; then on September 1, 2003, Dr. McCaskill signed off on plaintiff's DOT physical stating plaintiff could return to truck driving; Dr. Marcotte testified that in his opinion, it was not possible that plaintiff's PTSD had resolved during the interim. In Dr. Marcotte's opinion, plaintiff's representations during the DOT physical on September 1, 2003 that he was resting better and that he thought he was stable enough to drive a truck, were not sufficient to conclude his PTSD had resolved.
29. Dr. Marcotte was asked to assume that plaintiff was diagnosed with post-traumatic stress disorder by Dr. McCaskill in August 2003; that within a few weeks of the diagnosis, he applied for a job as a truck driver at Edwards Wood Products; that on October 9, 2003 he had an accident; and that at the time of the October 9, 2003 accident, plaintiff had not sought any formal treatment for post-traumatic stress disorder. Based on those facts, his review of the medical records, and his education and experience, Dr. Marcotte opined that plaintiff's PTSD had not resolved at the time of the October 9, 2003 accident.
30. When asked whether plaintiff would have been able to continue driving a truck if the October 2003 accident had not occurred, Dr. Marcotte pointed out that plaintiff was having difficulty driving in August 2003 and that he had symptoms that required medical intervention. It was impossible for Dr. Marcotte to state what would have occurred if plaintiff had received appropriate medical treatment after his diagnosis in August 2003. When asked whether plaintiff would have responded to the October 2003 accident the way he did without the May 2003 accident, Dr. Marcotte answered, "I don't believe we would be here today if he didn't have the May accident." Dr. Marcotte could not state that plaintiff's PTSD would not have progressed to the point that he was unable to work but for the October 9, 2003 accident.
 * * * * * * * * * * *
Based on the foregoing findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. Plaintiff sustained a compensable injury by accident on October 9, 2003 when he was involved in a motor vehicle accident while in the course and scope of his employment. N.C. Gen. Stat. § 97-2 (6)
2. As a result of the injury by accident, plaintiff suffered physical trauma, which resulted in a 3% permanent partial impairment of his right arm.
3. Plaintiff suffers from a pre-existing post-traumatic stress disorder caused by the May 16, 2003 accident. The greater weight of the competent, credible evidence does not support a finding that the pre-existing post-traumatic stress disorder was caused or materially aggravated by the October 9, 2003 accident. Ms. Whittle's opinion is not to a reasonable degree of medical certainty that the October 9, 2003 accident significantly contributed or was a material aggravation of plaintiff's pre-existing post-traumatic stress disorder. Additionally, there is no evidence that Ms. Whittle was ever qualified as an expert as to the treatment and diagnosis of post-traumatic stress disorder. N.C. Gen. Stat. § 97-25
4. Following the October 9, 2003 accident, plaintiff was released by Dr. Watt to return to work full duty as a truck driver on February 25, 2004. Suitable work was available with defendant-employer on February 25, 2004; however, plaintiff was terminated on October 16, 2003 in accordance with company policy due to having a preventable accident. Plaintiff has not proven by the greater weight of the evidence that he was disabled due to the compensable work incident of October 9, 2003 after February 25, 2004; therefore, plaintiff is not entitled to compensation for temporary total disability after February 25, 2004. N.C. Gen. Stat. §§ 97-29; 97-2(9); Hilliard v. Apex Cabinet Co.,305 N.C. 593, 290 S.E.2d 682 (1982); Russell v. Lowes Product Distribution, 108 N.C.App. 762, 765, 425 S.E.2d 454, 457 (1993).
5. Any disability resulting from plaintiff's post-traumatic stress disorder is not as a result of the October 9, 2003 accident and consequently, is not compensable under the N.C. Workers' Compensation Act. N.C. Gen. Stat. § 97-2(9)
6. Plaintiff is entitled to compensation for 3% permanent partial disability of the right arm. N.C. Gen. Stat. § 97-31(13). Defendants are entitled to a credit for temporary total disability compensation paid after February 25, 2004 against permanent partial disability benefits owed.
 * * * * * * * * * * *
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Plaintiff's claim for temporary total disability benefits after February 25, 2004 must and is hereby DENIED.
2. Plaintiff is entitled to compensation for the permanent partial disability of his right arm at the rate of $524.65 for a period of 7 and 2/7 weeks. Defendants are entitled to a credit for temporary total disability benefits paid after February 24, 2004. This credit may be taken against the permanent partial disability compensation owed for 3% permanent partial disability of the arm. The remaining credit may be taken against any future award of the Industrial Commission.
3. Plaintiff's claim for medical compensation for psychiatric treatment allegedly resulting from the October 4, 2003 injury must be DENIED.
4. Each side shall pay its own costs.
5. Defendants shall pay the costs due the Commission.
This the 18th day of May 2006
 S/___________________ DIANNE C. SELLERS, COMMISSIONER
CONCURRING:
 S/________________ PAMELA T. YOUNG, COMMISSIONER
 S/________________ THOMAS J. BOLCH, COMMISSIONER